United States District Court
Southern District of Texas
**ENTERED**
September 12, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TARA RICARD, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-1197 |
| | § | |
| THE PRUDENTIAL INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

This is a denial-of-benefits case brought under the Employee Retirement Income Security Act ("ERISA"). *See* 29 U.S.C. § 1132(a)(1)(B). Pending before the Court are cross-motions for summary judgment. The Court has reviewed the parties' briefing, the administrative record, and the other filings in the case. For the reasons given below, Defendant The Prudential Insurance Company of America's ("Prudential") motion (Dkt. 41) is **GRANTED**. Plaintiff Tara Ricard's ("Ricard") motion (Dkt. 42) is **DENIED**. This case is **DISMISSED WITH PREJUDICE**.

## I.    MEDICAL TIMELINE AND PROCEDURAL BACKGROUND

Ricard, whose counsel has withdrawn and who is now proceeding *pro se*, began working for JP Morgan Chase Bank, N.A. ("JPMC") in July of 2013, when she was 42 years old. (Dkt. 34-4 at pp. 11, 17). Initially hired as a client service manager, Ricard was promoted after three and a half years to Operations Division Leader. (Dkt. 34-5 at pp. 269, 358). The job was classified as physically sedentary, but its cognitive requirements included management of 13 people and oversight of "complex operational and project

issues[.]" (Dkt. 34-5 at pp. 269–70). This case arises from the aftermath of a serious allergic reaction suffered by Ricard.

### A. Ricard's severe allergic reaction and her first departure from JPMC

In late July of 2017, Ricard went to a hematologist for an intravenous iron infusion to combat iron deficiency anemia. (Dkt. 34-4 at pp. 42, 427). Ricard had a severe allergic reaction to the infusion that manifested itself as tachycardia, throat constriction, hypertension, shortness of breath, and a loss of consciousness. (Dkt. 34-4 at pp. 390, 434, 746). She was admitted to the hospital, monitored for three hours, treated with Benadryl and steroids, and sent home. (Dkt. 34-4 at pp. 390, 434, 746). Soon afterward, she complained of weakness, "numbness all over[,]" joint stiffness, migraine headaches, "memory problems," "cognitive dysfunction," and "spells of alteration of awareness[.]" (Dkt. 34-4 at pp. 37–44, 423, 427). She went to the emergency room at Baylor Carrollton Hospital twice in early August of 2017. (Dkt. 34-4 at p. 483). The first time, she was discharged the same day; the second time, she was admitted to the hospital for two days. (Dkt. 34-4 at p. 483). Ricard also returned to the Baylor Carrollton emergency room in late August after she had an allergic reaction to a Toradol injection administered by Dr. Nnamdi Dike ("Dr. Dike"), a neurologist. (Dkt. 34-4 at pp. 377–78, 565). She was treated with Benadryl and steroids and sent home. (Dkt. 34-4 at p. 567).

In August and September of 2017, Ricard took several weeks off from work. (Dkt. 34-5 at p. 358). She underwent several medical tests during those weeks, including a brain MRI; electromyographic and nerve conduction velocities; an EEG; a chest x-ray; an EKG;

and a brain CT scan. (Dkt. 34-4 at pp. 42, 375–82). All tests were normal. (Dkt. 34-4 at pp. 42, 375).

### B. Ricard's return to work and her treatment with Dr. Cantrell and Dr. Johnson

Ricard returned to work at JPMC full time in October of 2017. (Dkt. 34-5 at p. 358). However, she also consulted a neurologist named Dr. Deborah Combs Cantrell ("Dr. Cantrell") that month, complaining of "numbness and tingling of her upper and lower extremities, as well as her face, muscle spasms in the extremities, painful paresthesia[1] pains, [and] headaches every day." (Dkt. 34-4 at p. 390). Ricard also told Dr. Cantrell that she continued to experience memory problems, cognitive issues, and an inability to concentrate. (Dkt. 34-4 at p. 390). Although a neurological examination revealed nothing remarkable, Dr. Cantrell recommended "[f]ormal neurocognitive testing" to evaluate the memory, cognition, and concentration issues about which Ricard was still complaining. (Dkt. 34-4 at p. 391–92). Dr. Cantrell also recommended that Ricard implement seizure precautions until Dr. Cantrell could rule out seizure disorder. (Dkt. 34-4 at p. 391).

Following the appointment with Dr. Cantrell, Ricard consulted with a neuropsychologist, Dr. Kim Johnson ("Dr. Johnson"), in November of 2017. (Dkt. 34-4 at pp. 434–39). Dr. Johnson performed a neuropsychological evaluation and concluded that

---

[1] The National Institute of Neurological Disorders and Stroke defines "paresthesia" as "a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body."
https://www.ninds.nih.gov/health-information/disorders/paresthesia#:~:text=Paresthesia%20refers%20to%20a%20burning,%2C%20skin%20crawling%2C%20or%20itching.

Ricard was suffering from a "mild neurocognitive disorder" caused by her anaphylactic reaction to the iron infusion. (Dkt. 34-4 at pp. 434, 438). Dr. Johnson also diagnosed Ricard with "major depressive episode, moderate" and "adjustment disorder with anxiety." (Dkt. 34-4 at p. 438). Given her findings, Dr. Johnson opined that "[Ricard] should request accommodations at work to support significant cognitive deficits seen in the current evaluation as needed." (Dkt. 34-4 at p. 438). Dr. Johnson's recommended accommodations were that Ricard be given extra time to complete tasks; that JPMC provide verbal information to Ricard in written format; that JPMC allow Ricard to work without having to multi-task or divide her attention to the extent possible; that Ricard be given extra breaks; that JPMC give Ricard verbal and written reminders; that JPMC "[r]ecognize that a change in the office environment or of supervisors may be difficult for a person with a brain injury[;]" and that JPMC "[p]rovide weekly or monthly meetings with [Ricard] to discuss workplace issues and production[] levels[.]" (Dkt. 34-4 at pp. 438–39).

Ricard also followed up with Dr. Cantrell in November of 2017 after her consultation with Dr. Johnson. (Dkt. 34-4 at p. 388). Ricard told Dr. Cantrell that "her headaches [we]re somewhat improved[,]" and a neurological examination revealed nothing remarkable. (Dkt. 34-4 at 388). However, Dr. Cantrell also noted that Ricard's "[g]lobal cognitive screening examination was below average in attention, visuospatial, verbal functioning, executive functioning, informational processing speed, [and] motor skills." (Dkt. 34-4 at 388). Dr. Cantrell had not yet ruled out seizure disorder and continued to recommend seizure precautions. (Dkt. 34-4 at p. 389).

**C.  Ricard's second departure from JPMC and her disability claims**

Ricard stopped working again in December of 2017. (Dkt. 34-4 at p. 11; Dkt. 34-5 at p. 357). In the early months of 2018, Ricard went to individual therapy sessions with a neuropsychology resident supervised by Dr. Johnson. (Dkt. 34-4 at pp. 358–66). In February of 2018, Ricard, according to the notes from these sessions, "exhibited independent problem-solving skills" and "noted improvement on memory-related cognitive exercises, restoration of [her] sense of humor, and increased motivation." (Dkt. 34-4 at p. 363).

JPMC offered long-term disability coverage for which Prudential was the underwriter. (Dkt. 34-9 at pp. 33, 44). Ricard filed a claim for long-term disability benefits with Prudential in February of 2018. (Dkt. 34-4 at p. 11; Dkt. 34-5 at p. 357). Ricard also applied for Social Security disability benefits. (Dkt. 34-5 at pp. 303–04, 455).

In May of 2018, Prudential sent Ricard's medical records to Dr. Mi-Yeoung Jo ("Dr. Jo"), a neuropsychologist, for a file review. (Dkt. 34-4 at pp. 863–75). Dr. Jo noted that raw test data from Ricard's November 2017 neuropsychological evaluation showed that Ricard "ha[d] cognitive symptoms characterized by impairments in naming speed . . . , divided attention, visual-spatial judgment, visual recall, and aspects of language[,]" as well as "moderately elevated levels of depression and anxiety[.]" (Dkt. 34-4 at p. 873–74). The data further showed that Ricard "m[et] criteria for a major depressive episode." (Dkt. 34-4 at p. 874). Dr. Jo concluded that Ricard "ha[d] limitations with dividing her attention between two different stimuli, recalling complex visual information, and expressing herself

effectively." (Dkt. 34-4 at p. 874). In her report, Dr. Jo estimated that Ricard's limitations would last for "approximately 6 to 9 months from the time of her [November 2017] neuropsychological evaluation," meaning that the limitations were expected to last until between May of 2018 and August of 2018. (Dkt. 34-4 at p. 874). To explain that estimate, Dr. Jo pointed to Ricard's "improvement on memory-related cognitive exercises" during the sessions with Dr. Johnson in February of 2018. (Dkt. 34-4 at p. 874).

Prudential approved Ricard's long-term disability claim in May of 2018. (Dkt. 34-5 at p. 277). Prudential's approval letter reminded Ricard that Prudential would "periodically review" Ricard's claim and "request or obtain information" to ensure that Ricard was still eligible for long-term disability benefits. (Dkt. 34-5 at p. 278). In early June of 2018, Ricard's application for Social Security disability benefits was denied, and she requested reconsideration of that denial. (Dkt. 34-5 at pp. 303–04, 455).

### D. Dr. Falkowski's testing

As part of its periodic review of Ricard's eligibility for long-term disability benefits, Prudential scheduled a ten-hour round of neuropsychological testing with Dr. Jed Falkowski ("Dr. Falkowski") in late June and early July of 2018. (Dkt. 34-5 at pp. 345–67). After the neuropsychological testing, Dr. Falkowski concluded that Ricard could return to work without limitations or restrictions. (Dkt. 34-5 at p. 402). He explained that Ricard "demonstrated normal range performance on tasks of memory and mental flexibility" even though his analysis of Ricard's test results—which included "failure of

two stand-alone performance validity measures"[2]—indicated that Ricard was "suppress[ing] effort" and "over-reporting cognitive and psychological difficulties[.]" (Dkt. 34-5 at pp. 362, 402). In other words, according to Dr. Falkowski, the test results showed that Ricard scored in the normal range on tests of memory and mental flexibility despite giving "poor effort." (Dkt. 34-5 at pp. 362–64, 402). Since the performance validity measures that were administered to Ricard indicated poor effort, "[c]ognitive deficits [we]re not supported by [Dr. Falkowski's] testing data[.]" (Dkt. 34-5 at p. 364). Ultimately, Dr. Falkowski told Prudential that Ricard "appear[ed] to meet criteria for the diagnosis of an unspecified somatic symptom and related disorder;"[3] but he opined that, "when considering all aspects of the current evaluation, [Ricard's] condition d[id] not appear to warrant any limitations or restrictions regarding her work capacity at th[e] time." (Dkt. 34-5 at p. 402).

---

[2] "Performance validity measures" are designed to detect symptom exaggeration or malingering. (Dkt. 34-5 at pp. 359–60).

[3] The website for the Mayo Clinic has this to say about somatic symptom disorder:

> Somatic symptom disorder is characterized by an extreme focus on physical symptoms—such as pain or fatigue—that causes major emotional distress and problems functioning. You may or may not have another diagnosed medical condition associated with these symptoms, but your reaction to the symptoms is not normal.
>
> You often think the worst about your symptoms and frequently seek medical care, continuing to search for an explanation even when other serious conditions have been excluded. Health concerns may become such a central focus of your life that it's hard to function, sometimes leading to disability.
> https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776

### E.  Prudential's letter to Dr. Johnson and Dr. Cruz

In August of 2018, Prudential sent a letter to Ricard's neuropsychologist, Dr. Johnson, and to Ricard's primary care physician, Dr. Pamela Cruz ("Dr. Cruz"). (Dkt. 34-5 at pp. 423–24, 433–34). In the letter, Prudential summarized both Dr. Falkowski's opinions and those of Dr. Richard Day ("Dr. Day"), a physical medicine and rehabilitation doctor who worked for Prudential. (Dkt. 34-5 at pp. 423–24, 433–34). Both Dr. Falkowski and Dr. Day had concluded that Ricard "ha[d] sedentary work capacity." (Dkt. 34-5 at pp. 423–24, 433–34).

After summarizing the opinions of Dr. Falkowski and Dr. Day, Prudential's letter asked Dr. Johnson and Dr. Cruz to indicate whether they agreed or disagreed. If they disagreed, the letter asked them for their input:

> Based on the medical records reviewed, the evidence supports that Tara Ricard has sedentary work capacity.
>
> **If your opinion differs, please explain by providing:**
>
> - **The specific limitations (things she cannot do) with the clinically based data to support your opinion.**
> - **The specific medically necessary restrictions (things she should not do) with the clinically based data to support your opinion.**
> - **Please indicate how participation in work activities would be detrimental to your patient.  If so, how?**

Dkt. 34-5 at pp. 424, 434.

If they agreed, the letter asked them to simply sign a statement to that effect. Both Dr. Johnson and Dr. Cruz indicated their agreement. Here is Dr. Johnson's signature:

**If you agree with my summary please date and sign below:**

Signature: _[signature]_ Date: 8·24-18

Dkt. 34-5 at p. 424.

And here is Dr. Cruz's:

**If you agree with my summary please date and sign below:**

Signature: _[signature]_ Date: 9/6/18

Dkt. 34-5 at p. 434.

Along with her signature, Dr. Johnson included the following handwritten note:

**Comments:**

_I will defer to most recent neuropsychological testing performed by the independent neuropsych. I have not evaluated her since 11/2017 so it is probable that she has experienced improvement of symptoms since that time._ _[signature]_

Dkt. 34-5 at p. 422.

### F.  Prudential's termination of Ricard's long-term disability benefits

In September of 2018, after receiving the responses from Dr. Johnson and Dr. Cruz, Prudential sent Ricard a letter terminating her long-term disability benefits. (Dkt. 34-5 at

pp. 439–41). The letter stated that Prudential's decision was based on the determination that Ricard had "sedentary work capacity" and did not have "a cognitive disorder that would preclude full time sedentary work." (Dkt. 34-5 at p. 441). In support, the letter cited not only the conclusions of Dr. Falkowski and Dr. Day but the acquiescence of Ricard's own doctors:

> A summary of the Physical and Medicine Rehabilitation review and the results of the Neuropsychological Testing were sent to Dr. Johnson and Dr. Cruz. Dr. Johnson stated that she would defer to the most recent neuropsychological testing since she had not seen you since November 2017, as it is probable that you have experienced improvement of symptoms since that time. Dr. Cruz agreed with our assessment of capacity and did not provide any additional information.
> Dkt. 34-5 at p. 441.

A week after Prudential terminated Ricard's long-term disability benefits, the Social Security Administration denied Ricard's request for reconsideration of its denial of Social Security disability benefits. (Dkt. 34-5 at p. 455).

### G. Ricard's first appeal

In March of 2019, Ricard appealed Prudential's termination of benefits with the help of counsel. (Dkt. 34-5 at p. 473). In her appeal letter, Ricard argued that Prudential abused its discretion by terminating previously approved long-term disability benefits when Ricard's condition had not significantly changed. (Dkt. 34-5 at p. 475). To support her appeal, Ricard provided additional medical records, as well as a vocational rehabilitation assessment conducted by a vocational rehabilitation counselor named Wallace Stanfill ("Stanfill"). (Dkt. 34-5 at p. 497). Stanfill opined that Ricard was "totally disabled from" her job with JPMC "or from any other occupation, at any level of physical exertion, for

which she is trained and/or is reasonably qualified, even on a part-time basis[.]" (Dkt. 34-6 at p. 202). In support, Stanfill cited "Ms. Ricard's treating physician's statements, and Neurological testing"—a reference to Dr. Johnson's initial November 2017 neuropsychological evaluation. (Dkt. 34-6 at pp. 195, 202).

However, Stanfill did not discuss Dr. Johnson's subsequent deference to Dr. Falkowski's findings. (Dkt. 34-6 at pp. 194–202). Moreover, the additional records provided by Ricard indicated that Dr. Cantrell had conducted two more neurological examinations in July and September of 2018, both of which were normal. (Dkt. 34-6 at pp. 301–04). Dr. Cantrell no longer recommended seizure precautions. (Dkt. 34-6 at pp. 301– 04). Another neurologist, Dr. Desiree Thomas, documented a normal neurological examination in September of 2018 and further noted that she was not sure that Ricard's headaches warranted a nerve block or that Ricard needed another brain MRI. (Dkt. 34-6 at p. 218). None of the additional medical records provided by Ricard included any restrictions or limitations on sedentary work.

In April of 2019, Prudential sent Ricard's appeal file to a neuropsychologist and a neurologist, neither of whom had been involved in the initial termination of Ricard's benefits. (Dkt. 34-6 at p. 343). The neuropsychologist, Dr. Jeremy Hertza ("Dr. Hertza"), noted that Ricard had reported "cognitive and psychiatric debility and an inability to perform gainful activity in the context of an anaphylactic reaction on 07/28/17." (Dkt. 34-6 at p. 350). After reviewing Ricard's file, Dr. Hertza concluded that there was "no evidence of psychiatric treatment of a frequency and intensity as to reasonably preclude working[;]" that there were "no indicators of psychiatric severity that would warrant

restrictions[;]" and that there were "no valid and measurable findings to even reasonably grossly support functional debility as reported." (Dkt. 34-6 at p. 350). Dr. Hertza also contacted Dr. Johnson. (Dkt. 34-6 at p. 349). According to Dr. Hertza's report, Dr. Johnson "stated that she last saw [Ricard] in 2017 but she had a note from [Ricard's] recent neuropsychology provider that stated that [Ricard] needs a quiet place to work, have excess [sic] to head phones and no manager position." (Dkt. 34-6 at p. 349). But it is unclear from the record who the "recent neuropsychology provider" mentioned by Dr. Johnson was, and there are no medical records indicating that Ricard needed any accommodations or restrictions.

The neurologist who reviewed Ricard's appeal file for Prudential, Dr. David Burke ("Dr. Burke"), concluded after his review that "work activity restrictions [we]re not medically necessary" for Ricard. (Dkt. 34-6 at p. 390). Dr. Burke noted that Ricard's own "treating neurologist[s we]re not restricting her work activity" and that Dr. Thomas had determined "that [Ricard's] headaches did not warrant a nerve block or Brain MRI w/contrast[.]" (Dkt. 34-6 at pp. 389–90). Ricard had, in fact, told Dr. Cantrell that she did not want a nerve block. (Dkt. 34-6 at p. 389). Dr. Burke pointed out that the tests and examinations documented in Ricard's file—which included nerve conduction studies, electromyogram tests, brain MRIs, neck CTs, EEGs, cervical x-rays, and physical examinations—were normal and that "there [wa]s no documentation of the duration, frequency, severity, or intensity of symptoms, such as Headache Logs that would support headaches of the severity to result in a loss of function[.]" (Dkt 34-6 at p. 389). Dr. Burke further opined that Ricard's "own self-reported activity[,]" which included "driving, caring

for a toddler, going to the gym for exercise, reading, watching TV, using the computer, and managing her finances[,]" was "inconsistent with headaches or paresthesias of the severity to result in a loss of function." (Dkt. 34-6 at p. 389). Dr. Burke also cited a "Special Investigation of [Ricard's] online presence" that allegedly uncovered evidence that Ricard "was running a business called Precious Suggestions" out of her house that made specialized t-shirts. (Dkt. 34-6 at pp. 385, 390).

In May of 2019, Prudential rejected Ricard's first appeal and upheld its decision to terminate her long-term disability benefits. (Dkt. 34-6 at p. 395). Prudential concluded that Ricard's "reports of impairing migraines and parathesias [we]re out of proportion to and inconsistent with the medical documentation, physical examination findings, and testing, as well as [Ricard's] own self-reported activity." (Dkt. 34-6 at p. 398).

**H. Ricard's second appeal**

In October of 2019, Ricard again appealed Prudential's termination of benefits. (Dkt. 34-6 at p. 443). In her second appeal letter, Ricard argued that: the file reviews conducted by Dr. Hertza and Dr. Burke were unreliable; the activities (such as driving, caring for her toddler, and going to the gym) cited by Dr. Burke did not constitute evidence that Ricard could return to work; the t-shirt business mentioned by Dr. Burke was owned by one of Ricard's sons; Prudential had improperly disregarded her complaints of pain; Prudential had selectively reviewed the record to "cherry-pick" evidence that supported termination of Ricard's benefits; and Prudential could not terminate previously approved long-term disability benefits when Ricard's condition had not significantly changed. (Dkt. 34-6 at pp. 443–52). Ricard attached additional medical records to her second appeal letter

documenting two visits that she made to an oncology practice that stemmed from complaints of anemia and a low white-blood-cell count. (Dkt. 34-6 at pp. 455–61). The new medical records documented an unremarkable physical examination. (Dkt. 34-6 at pp. 455–56).

Prudential again sent Ricard's file to Dr. Hertza and Dr. Burke, who provided supplemental reports. (Dkt. 34-6 at pp. 499–505). After reviewing the file, Dr. Hertza indicated to Prudential that his "opinion remain[ed] intact and unchanged." (Dkt. 34-6 at p. 499). Dr. Hertza opined that Ricard's appeal letter, despite its insistence that Ricard was "totally and indefinitely disabled[,]" provided "no plausible explanation as to why validity measures were not passed on [Dr. Falkowski's] neuropsychological assessment" and "offer[ed] no new objective and measurable evidence of bonafide [sic] neuropsychological functional impairment of such a severity as to preclude all gainful activity[.]" (Dkt. 34-6 at p. 499). Like Dr. Hertza, Dr. Burke told Prudential that his second look at Ricard's file "did not alter [his] prior assessment." (Dkt. 34-6 at p. 504). Dr. Burke opined that "[t]here [wa]s no further objective evidence of neurological physical functional limitations that would preclude [Ricard] from work, as evidenced by [Ricard's new medical records'] own documented unremarkable physical examination findings in the setting of mild anemia." (Dkt. 34-6 at p. 504).

In November of 2019, Prudential rejected Ricard's second appeal and again upheld its decision to terminate her long-term disability benefits. (Dkt. 34-6 at p. 536). Prudential "again determined [that] Ricard's reports of impairing migraines and parathesias [we]re

out of proportion to, and inconsistent with, the medical documentation, examination findings, testing, and [Ricard's] own reported activity." (Dkt. 34-6 at p. 539).

### I.   This case

Ricard filed this lawsuit in April of 2020, and she asserts a cause of action for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B). (Dkt. 1). Ricard's counsel has withdrawn, and she is proceeding *pro se*. (Dkt. 25).

### II.   <u>LEGAL STANDARDS</u>

Both parties have moved for summary judgment under Federal Rule of Civil Procedure 56.

### A.  Summary judgment in ERISA denial-of-benefits cases

The summary judgment standard for ERISA denial-of-benefits cases "is unique because the Court acts in an appellate capacity reviewing the decisions of the administrator of the plan." *McFadden v. Prudential Insurance Co. of America*, 877 F. Supp. 2d 481, 485 (S.D. Miss. 2012); *see also Threadgill v. Prudential Securities Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998). The standard of review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, then the standard of review is abuse of discretion. *Rittinger v. Healthy Alliance Life Insurance Co.*, 914 F.3d 952, 955 (5th Cir. 2019).

### B.  Choice of law

Here, the parties agree that the governing plan gives Prudential discretionary authority to determine eligibility for benefits and to construe the terms of the plan. (Dkt. 41 at p. 19; Dkt. 42 at p. 4). However, Ricard contends that *de novo* review is nevertheless appropriate because Section 1701.062 of the Texas Insurance Code bars discretionary clauses in insurance policies. (Dkt. 42 at p. 4).

The Court disagrees with Ricard. The plan at issue was delivered in Delaware and contains a Delaware choice of law provision. (Dkt. 34-7 at pp. 2–3). Ricard bears the burden of proving that the plan's Delaware choice of law provision should not be enforced. *Singletary v. United Parcel Service, Inc.*, 828 F.3d 342, 351 (5th Cir. 2016); *see also Jimenez v. Sun Life Assurance Co. of Canada*, 486 Fed. App'x 398, 408–09 (5th Cir. 2012). Here, Ricard only argues that "ERISA does not preempt state bans on discretionary clauses[.]" (Dkt. 45 at p. 4). Assuming that Ricard's statement of preemption law is correct, it is immaterial. The pertinent question is not whether ERISA preempts state law, but whether Texas law or Delaware law should apply.

 Ricard has not met her burden to establish that Texas law, rather than Delaware law, should govern. Since Delaware law allows the inclusion of discretionary clauses in insurance policies, *Eastman v. Life Insurance Co. of North America*, 322 F. Supp. 3d 1255, 1257 (M.D. Ala. 2018), the Court will apply the abuse of discretion standard. *Cf. Burrell v. Metropolitan Life Insurance Co.*, No. 1:18-CV-174, 2020 WL 532934, at *6 (W.D. Tex. Feb. 3, 2020), *adopted*, 2020 WL 13111147 (W.D. Tex. Mar. 23, 2020) (holding that

Texas's ban on delegation clauses in insurance policies did not apply when the policy was issued in Connecticut and contained a New York choice of law provision).

## C. Abuse of discretion

A federal district court reviewing for abuse of discretion in an ERISA denial-of-benefits case acts in a "very narrowly restricted" appellate role. *McCorkle v. Metropolitan Life Insurance Co.*, 757 F.3d 452, 456 (5th Cir. 2014). As the Fifth Circuit has summarized the standard of review:[4]

> We reach a finding of abuse of discretion only when the plan Administrator acted arbitrarily or capriciously. A decision is arbitrary if it is made without a rational connection between the known facts and the decision.
>
> Even though the Administrator's decision to deny benefits must be supported by substantial evidence, *substantial evidence* is merely more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Ultimately, a court's review of the Plan Administrator's decision need not be particularly complex or technical; it need only assure that the Administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end. Obviously, no court may substitute its own judgment for that of the plan Administrator.
>
> *Id*. at 457–58 (footnotes, citations, and internal quotation marks omitted; emphasis in *McCorkle*).

"Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence,

---

[4] An abuse of discretion review of an administrator's interpretation of the plan includes a preliminary inquiry into whether the plan administrator's decision was "legally correct." *McCorkle v. Metropolitan Life Insurance Co.*, 757 F.3d 452, 457 n.10 (5th Cir. 2014). However, "[b]ecause the parties have not briefed whether [Prudential's] decision was 'legally correct,' but rather debate whether the benefits denial ultimately was an 'abuse of discretion,' [the Court] dispense[s] with step one of the analysis." *Id*.

including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim." *Estate of Bratton v. National Union Fire Insurance Co. of Pittsburgh, PA*, 215 F.3d 516, 521 (5th Cir. 2000); *see also Crosby v. Louisiana Health Service and Indemnity Co.*, 647 F.3d 258, 263 (5th Cir. 2011).

## III.   <u>ANALYSIS</u>

The ERISA plan at issue here provides long-term disability benefits when: (1) the insured is unable to perform the material and substantial duties of their regular occupation due to their sickness or injury; (2) the insured is under the regular care of a doctor; and (3) the insured has a 20% or more loss in their monthly earnings due to their sickness or injury. (Dkt. 34-9 at p. 17). The plan defines the term "material and substantial duties" as "duties that are normally required for the performance of your regular occupation . . . and [that] cannot be reasonably omitted or modified." (Dkt. 34-9 at p. 17). The plan defines the term "regular occupation" as "the occupation you are routinely performing when your disability begins . . . as [that occupation] is normally performed[.]" (Dkt. 34-9 at p. 17). The plan explains that long-term disability benefits will cease when the insured is no longer disabled under the terms of the plan or when the insured "fail[s] to submit proof of continuing disability satisfactory to Prudential." (Dkt. 34-9 at p. 26).

The administrative record shows that Prudential's decision to terminate Ricard's long-term disability benefits was supported by substantial evidence and was not arbitrary or capricious.[5]

---

[5] On this record, the Court notes that it would also grant Prudential's motion under a *de novo* standard of review.

## A. The medical records

Notably, the record reflects that, before terminating Ricard's benefits, Prudential solicited the opinions of Ricard's own doctors, who agreed with Prudential's determination that Ricard had the ability to perform sedentary work. (Dkt. 34-5 at pp. 422–34). In response to Prudential's inquiry, Ricard's neuropsychologist, Dr. Johnson, specifically told Prudential that she deferred to Dr. Falkowski's neuropsychological examination, the results of which indicated that Ricard did not warrant any limitations or restrictions regarding her work capacity and that Ricard was suppressing effort and over-reporting cognitive and psychological difficulties. (Dkt. 34-5 at pp. 362, 402, 422). Dr. Johnson, who had not seen Ricard in nine months at that point, stated that it was "probable" that Ricard's symptoms had improved during those nine months. (Dkt. 34-5 at p. 422).

Moreover, during her appeals of Prudential's decision, Ricard was unable to point to a single medical record indicating that she needed any accommodations or restrictions in order to perform sedentary work. Similarly, Ricard's summary judgment briefing in this case does not highlight any medical records indicating that she needed any accommodations or restrictions to perform sedentary work at the time that Prudential terminated her benefits.

## B. Stanfill

In contesting Prudential's decision, Ricard argues that the report of Stanfill, her vocational rehabilitation expert, established to Prudential that she was disabled. (Dkt. 44

at p. 6). However, in his report, Stanfill relied on Dr. Johnson's initial November 2017 neuropsychological evaluation, and he did not discuss Dr. Johnson's subsequent deference to Dr. Falkowski's findings that Ricard could return to work without limitations or restrictions and that Ricard was suppressing effort and over-reporting cognitive and psychological difficulties. (Dkt. 34-6 at pp. 195, 202). Stanfill's report does not establish that Prudential acted arbitrarily or capriciously.

### C. Evidence of a change in condition

Ricard further argues that Prudential "has failed to present any evidence that [her] impairments have significantly changed, to warrant its termination of [long-term disability] benefits" and that Prudential's decision "to terminate benefits in the absence of a change in [Ricard's] condition" after initially awarding benefits was arbitrary and capricious. (Dkt. 44 at pp. 7–8). The Court finds this argument unpersuasive. First, Ricard's argument flips the burden of proof. "The plan does not impose a burden of proof on [Prudential] to prove that [Ricard] can return to employment. Rather, to *continue* disability benefits [Ricard] must demonstrate that [s]he cannot resume active service because of disability." *Peifer v. Bellsouth Telecommunications, Inc.*, No. 94-2888, 1995 WL 63062, at *5 (E.D. La. Feb. 14, 1995), *aff'd*, 74 F.3d 1238, 1995 WL 783450 (5th Cir. Dec. 8, 1995) (emphasis in *Peifer*). !

Furthermore, the record refutes Ricard's argument. When Prudential approved Ricard's claim for long-term disability benefits in May of 2018, it did so based on the report of Dr. Jo, a neuropsychologist. After looking at Ricard's file, including Dr. Johnson's November 2017 neuropsychological evaluation, Dr. Jo opined that Ricard had some

limitations related to dividing her attention between two different stimuli, recalling complex visual information, and expressing herself effectively; but Dr. Jo did not believe that the limitations were permanent, and she estimated that the limitations would last until between May of 2018 and August of 2018. (Dkt. 34-4 at p. 874). To explain her estimate, Dr. Jo pointed to Ricard's "improvement on memory-related cognitive exercises" during sessions with Dr. Johnson in February of 2018. (Dkt. 34-4 at p. 874).

Subsequent testing supported Dr. Jo's estimate. When Prudential decided to terminate Ricard's benefits in September of 2018, it had in hand the results of a second round of neuropsychological testing conducted by Dr. Falkowski. Dr. Falkowski's tests indicated that Ricard could return to work without limitations or restrictions. (Dkt. 34-5 at p. 402). And Ricard's own neuropsychologist, Dr. Johnson, deferred to Dr. Falkowski's findings because Dr. Johnson herself had expected Ricard's condition to improve. (Dkt. 34-5 at p. 422). The record contains substantial evidence that Ricard's condition improved between May of 2018, when Prudential approved Ricard's claim, and September of 2018, when Prudential terminated Ricard's benefits.

### D.  Conflict of interest

Ricard further argues that Prudential's handling of her claim was tainted by a "structural conflict of interest" because Prudential is both the claims administrator and the plan funder. (Dkt. 42 at p. 3; Dkt. 44 at p. 13). Ricard has not submitted any evidence on this issue, but Prudential does not deny that it plays a dual role in making benefits determinations and funding the benefit plan.

Assuming that Prudential has a structural conflict of interest, that conflict is "but one factor among many" that the Court must take into account when determining whether Prudential abused its discretion. *Schexnayder v. Hartford Life and Accident Insurance Co.*, 600 F.3d 465, 470 (5th Cir. 2010). "The weight that [a] conflict will have relative to other factors changes . . . depending upon the circumstances of a particular case." *Id*. For example, "a reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest procedural unreasonableness." *Id*. at 469 (quotation marks omitted). On the other hand, a reviewing court "need not decide how much weight should be given to [a] potential conflict" if the effect of that conflict "is clearly outweighed by the substantial evidence supporting [the plan administrator's] decision." *Crowell v. CIGNA Group Insurance*, 410 Fed. App'x 788, 794 (5th Cir. 2011).

Here, Ricard presents no evidence suggesting procedural unreasonableness. Moreover, as discussed above, the record reflects that Prudential consulted numerous independent doctors and neuropsychologists, including Ricard's own treaters, before it terminated Ricard's long-term disability benefits. When Prudential terminated Ricard's benefits, no doctor or neuropsychologist indicated that Ricard needed any accommodations or restrictions to perform sedentary work; and when Ricard appealed Prudential's determination, she still presented no medical records showing that restrictions were warranted. Although Stanfill, Ricard's vocational rehabilitation expert, opined that Ricard was totally disabled, he relied on Dr. Johnson's initial November 2017 neuropsychological evaluation, and he did not discuss Dr. Johnson's subsequent deference to Dr. Falkowski's

findings that Ricard could return to work without limitations or restrictions and that Ricard was suppressing effort and over-reporting cognitive and psychological difficulties. The record contains no sign that any structural conflict of interest worked to Ricard's detriment. Any potential conflict of interest is clearly outweighed by the substantial evidence supporting Prudential's decision.

## IV.   <u>CONCLUSION</u>

For the reasons given below, Defendant The Prudential Insurance Company of America's motion for summary judgment (Dkt. 41) is **GRANTED**, and Plaintiff Tara Ricard's motion for summary judgment (Dkt. 42) is **DENIED**. This case is **DISMISSED WITH PREJUDICE**. The Court will issue a separate final judgment.

SIGNED at Houston, Texas, on September 12, 2022.

_George C. Hanks Jr_
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE